BILOON'S ELECTRICAL SERVICE, INC., a Delaware Corporation, Arthur A. Biloon and Irene F. Biloon, Plaintiffs,

v.

CITY OF WILMINGTON, a municipal corporation of the State of Delaware, Defendant.

Superior Court of Delaware, New Castle County.

Submitted Oct. 19, 1978.

Decided March 28, 1979.

C. Waggaman Berl, Jr., Wilmington, for plaintiffs.

Richard Galperin of Flanzer & Isaacs, Wilmington, for defendant.

LONGOBARDI, Judge.

This is an action for compensatory and punitive damages arising out of the destruction of Plaintiffs' appliance repair shop by fire on October 20, 1975. Plaintiffs allege that the destruction of their place of business was a result of the City's failure to provide adequate police and fire protection. The Defendant municipality has moved for summary judgment.

Late in the afternoon of October 20, 1975, a civil disturbance developed in Wilmington in the area bounded by Third Street on the south, Fifth Street on the north, Broom Street on the west and Jackson Street on the east. The trouble apparently began with the setting of fires followed by sporadic hurling of bottles and bricks. A crowd of 20 or 30 people fought with police officers.

According to his affidavit, Jerome M. Donohue, Chief of Battalion Two of the Wilmington Bureau of Fire, was called to the scene at 6:30 p. m. to meet with Police Lieutenant Barry at Second and Harrison Streets. Barry told Donohue that "the temper of civilians in the area was at the breaking point" and that there was a small trash fire at Fourth and Harrison Streets. At this point, Donohue advised Barry that he would not dispatch fire equipment for small trash fires and that all fires were to be confirmed by police before fire fighting equipment would be dispatched to the scene. In addition, all fire fighting equipment was to be escorted to the fire location by police.

Around 6:00 p. m., Mrs. Edna Keatts of 406 North Harrison Street turned on her police radio and heard a report of a fire. Mrs. Keatts immediately went to the door of her home and saw smoke "just pouring out" around the eaves of Plaintiffs' building at Fourth and Harrison Streets. At 6:05 p. m., by her estimate, Mrs. Keatts called the City Fire Department to report the fire. She hung up, looked out, saw "smoke pouring out more than ever" and called the fire department a second time. Seeing a dog trapped inside, Mrs. Keatts called twice more, the fourth and final call being 10 to 15 minutes after the first or between 6:15 p. m. and 6:20 p. m. She estimated that fire fighting equipment arrived anywhere from 6 to 15 minutes after the last call or between 6:21 p. m. and 6:35 p. m. By this time, the building was in flames and the fire was "raging."

Again, according to his affidavit, Battalion Chief Donohue was notified of a fire at Fourth and Harrison Streets at 6:58 p. m. whereupon he dispatched fire vehicles and the rescue squad. Upon Donohue's arrival, Plaintiffs' store was "heavily involved in fire with heavy smoke on the second and third floors." The firefighters were accosted by a hostile crowd which pelted them with bricks and bottles and prevented access to hydrants. Not until additional units of police were called in could hoses be connected to the hydrants; however, the crowd continued its bombardment and the police used tear gas to disperse the rioters. Firefighters then donned breathing apparatus and moved in on the blaze. By the time the fire was brought under control at 11:34 p. m., Plaintiffs' store was virtually destroyed.

Resolving conflicts in the above account in a manner favoring Plaintiffs, the non-moving party, the following can be said:

(1) Immediately prior to and during the burning of Plaintiffs' shop, authorities were faced with a civil disturbance extending over several blocks involving crowds setting many small fires.

(2) A battalion chief of the municipal fire department, who was briefed by a police lieutenant upon reaching the scene at 6:30 p. m., made the conscious, deliberate decision to delay sending fire fighting apparatus until reports of fires could be confirmed and a police escort could be arranged.

(3) Fire department personnel and equipment reported to Plaintiffs' shop. Four calls had been made to the Fire Department starting at 6:05 p. m. by an eyewitness to the fire stressing the urgent need for action and the serious nature of the fire.

(4) As anticipated by the Battalion Chief, fire department personnel were severely hampered and jeopardized in battling the blaze until police officers were called in to disperse a hostile crowd.

Plaintiffs apparently allege negligence on the part of the City in: (a) failure to provide adequate police protection to control the situation; and (b) delay in dispatching fire equipment to the scene. In a separate count, (c) the Plaintiffs allege that the decision by a Fire Battalion Chief to delay deployment of fire fighting equipment until the fire was confirmed by the police and the police afforded protection was a conscious and deliberate deprivation or taking of property by the City without due process.

Several affirmative defenses are relied upon by the City. Initially, the Defendant relies on the doctrine of municipal tort immunity based on the performance of "governmental" functions. The City further argues the absence of a "special" or "private" duty running from the City to Plaintiffs to provide police and fire protection. Further, Defendant argues that municipalities cannot be held liable in tort for damage resulting from decisions of public officials engaged in "discretionary functions."

Briefing was completed in this case before the decision in *City of Wilmington v. Spencer*, Del.Supr., 391 A.2d 199 (1978) in which the Supreme Court found that the City had waived immunity from suit for the negligent acts of its agent. On the same day, the Court handed down its decision in another case involving municipal liability. *Thomas v. Mayor and Council of the City of Wilmington*, Del.Supr., 391 A.2d 203 (1978). *Spencer* involved a school crossing guard who waved children into an intersection although he could not see on-coming traffic while *Thomas* involved the alleged failure of municipal inspectors to detect violations of the city housing code. Reading the two cases, this much is certain: the City has no sovereign immunity ". . . at least to the limit of the issues tendered . . ." to quote from Justice Duffy's majority opinion in *Spencer*. 391 A.2d at 202.

This cryptic statement leaves to later decisions the role of defining the precise parameters of municipal tort liability rather than the question of municipal immunity. In the former case, any impediments to the institution of suits against the municipality have been removed but without guaranteeing liability and without creating any new cause of action where none have heretofore existed. 57 Am.Jur.2d *Municipal, Etc. Tort Liability* § 54.

Traditionally, the history of sovereign immunity in Delaware followed a trend of erosion that culminated in *City of Wilmington v. Spencer, supra*, and *Thomas v. Mayor and Council of the City of Wilmington, supra*.

In *Flait v. Mayor & Council of Wilmington*, Del.Supr., 48 Del. 89, 97 A.2d 545 (1953), although criticizing the doctrine of immunity, the Supreme Court accepted it on the basis of *stare decisis*. It approved the generally accepted distinction then in favor which provided municipal immunity from torts occasioned during the performance of a "governmental" function but did not provide immunity for torts occasioned during the performance of "proprietary" functions. If the language in the *Spencer* case, *supra*, left any doubt about the viabili-

ty of immunity based on "governmental function", it was dissipated by the *Thomas* decision, *supra*, which characterized the duties of the City Housing Inspectors as a "governmental" function and reversed the lower court's dismissal which was based on "governmental" immunity.

■ In a way, the arbitrary distinction between "governmental" function and "proprietary" function and even the use of those terms confounds the basic issue of liability in cases where public officials in the performance of policy decisions run the risk of liability. The point is there must be some areas of political administration which should not be subject to judicial scrutiny. Traditionally, this could be characterized as the recognition of the separation of powers doctrine between the three separate branches of government. More importantly, it involves the intellectual honesty to admit it would be intolerable to allow a judge or jury to decide the reasonableness of a governmental policy decision. And although the law is fraught with references to the demise of "governmental" immunity, there should be some exceptions to liability for performing a "governing" function. The distinction that is made is that even though "governmental immunity" has been abrogated by *Spencer, supra*, and *Thomas, supra*, there must be exceptions to municipal liability when harm results from merely governing. The issue is more graphically described in the case of *Amelchenko v. Borough of Freehold*, N.J.Supr., 42 N.J. 541, 201 A.2d 726 (1964), wherein the Court said:

"Moreover, when a street department is established, obviously the governing body determines the number of employees to be assigned to it and the amount of snow removal equipment to be purchased and made available for ordinary municipal needs. That determination is a matter of judgment committed under our system of government to the local authority and it should not be interfered with by the courts in a tort damage suit."

Additionally,

"Moreover, establishment of a general method of handling snowstorms is a mat-

ter of planning. The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with them is legislative or governmental in nature. Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the public entity they represent. It cannot be a tort for government to govern." 201 A.2d p. 730.

The complications are enormous. See also Van Alstyne, *Governmental Tort Liability: A Decade of Change*, 1966 U.Ill.L.F. 919, 975 wherein Professor Van Alstyne says:

". . . and it is difficult to discern how a lay jury can decide rationally in the artificial environment of a civil trial that a responsible public official or board acted negligently in making a particular discretionary decision which ultimately had tort consequences. Almost invariably, a reasonable man could have decided either way; the presence of discretion and judgment as elements in the decisional process necessarily implies choice between alternatives which are equally defensible as rational conclusions drawn from good faith evaluation of competing arguments and policies . . . ."

This introduces the distinction between the word "governmental" as used in the stricken "governmental immunity" of *Spencer, supra*, and *Thomas, supra*, and introduces the concept of some limitations on liability based on the separation of powers doctrine but also on the more practical acceptance of the futility, waste and insurmountable complications of delving into the "governing", "policy-making" decisions of every governmental body. For instance, could there be tort liability for the refusal

of a city to place a stop sign at a particular location because the plaintiff could produce evidence that one should have been placed there? Will police be responsible for not following a "suspicious" person who later rapes a woman? Will municipalities' budgets on police manpower be subject to review because more manpower might have prevented a crime wave? These questions and many similar ones have been answered in the negative by courts in jurisdictions where immunity had been abrogated.

 The fundamental principle apart from the question of sovereign immunity is that a municipality is not liable for failure to supply general police or fire protection. *Motyka v. City of Amsterdam*, N.Y.App., 15 N.Y.2d 134, 256 N.Y.S.2d 595, 204 N.E.2d 635 (1965); *Huey v. Town of Cicero*, Ill. Supr., 41 Ill.2d 361, 243 N.E.2d 214 (1968); 18 E. McQuillin, *Law of Municipal Corporations* § 53.04a (3rd Ed.1977); *Mechem on Public Officers* §§ 597, 599 (1890). This rule was recently applied in *Frankfort Variety, Inc. v. City of Frankfort*, Ky.Supr., 552 S.W.2d 653 (1977) to bar liability where a fire rekindled some six hours after fire-fighters had left the scene. In cases of property damage resulting from civil disturbances, actions alleging failure to provide adequate protection have been unsuccessful. See *Westminister Investing Corp. v. G. C. Murphy Co.*, D.C.Cir., 140 U.S.App. D.C. 247, 434 F.2d 521 (1970); *Asian Cons. Lab, Inc. v. City of Sara. Springs*, N.Y.A.D., 49 A.D.2d 981, 374 N.Y.S.2d 375 (1975). General allegations relative to negligent conduct at the scene of the fire are insufficient to sustain a cause of action against the municipality. *LaDuca v. Town of Amherst*, N.Y.A.D., 53 A.D.2d 1011, 386 N.Y. S.2d 269 (1976).

Many courts have experienced the difficulty of labeling the legal theories supporting such limits to liability. There has been developed, for instance, the "public" duty v. "private" duty theory. *H. R. Moch Co. v. Rensselaer Water Co.*, N.Y.App., 247 N.Y. 160, 159 N.E. 896 (1928); *Simpson's Food Fair v. Evansville*, Ind.App., 149 Ind.App. 387, 272 N.E.2d 871 (1971), anno. 46 A.L.

R.3d 1077; *Leger v. Kelley*, Conn.Supr., 142 Conn. 585, 116 A.2d 429 (1955); *Frankfort Variety, Inc. v. City of Frankfort, supra; Riss v. City of New York*, N.Y.App., 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968). One of the problems inherent in the public/private duty concept is the necessity of drawing lines distinguishing public from private duty.

Immunity or non-liability from suit for "discretionary acts" is another concept independent of the discarded broad immunity for "governmental functions" and the public/private duty concept.

"That many states fail to make the distinction between governmental and proprietary functions, having equated the tort liability of municipal corporations with that of private individuals and corporations through abrogation or modification of the doctrine of sovereign immunity with respect to municipalities, is not to be taken to mean that the liability of municipal corporations for the torts of their employees is absolute; rather, those jurisdictions abolishing municipal governmental immunity instead recognize immunization from tort liability in the exercise of legislative and judicial, or quasi-legislative and quasi-judicial, functions." 18 E. McQuillin, *Law of Municipal Corporations* § 53.04a at 122 (1977).

This type of limits to liability has been extended to executive functions involving official judgment or "discretion" as contrasted with "ministerial" acts. Few would quarrel with the goal of such non-liability, namely, to assure the courts will refrain from passing on decisions which are strictly within the province of coordinate branches of government. However, attempts to effectuate this concept using "discretion" as a touchstone have resulted in inconsistency, confusion and criticism. One court described the semantical difficulties thusly:

". . . it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit some discretion in the manner of its performance, even if it involved only the driving of a nail." *Ham v. Los Angeles*

*County*, Cal.App., 46 Cal.App. 148, 162, 189 P. 462, 468 (1920).

One unifying trend is the growing tendency of courts to depart from the traditional formulas and instead base decisions on the underlying purpose of the "discretionary" doctrine.

> " 'Although it may not be possible to set forth a definitive rule which would determine in every instance whether a governmental agency is liable for discretionary acts of its officials, various factors furnish a means of deciding whether the agency in a particular case should have immunity, such as the importance to the public of the function involved, the extent to which governmental liability might impair free exercise of the function, and the availability to individuals affected of remedies other than tort suits for damages'." *Johnson v. State*, Cal. Supr., 69 Cal.2d 782, 787, 73 Cal.Rptr. 240, 245, 447 P.2d 352, 357 (1968).

The essential factor animating the policy-oriented or public policy approach is the principle that certain decisions of the executive or legislative branches of government should not be reviewed by judge or jury. A California court cited the pithy words of Justice Jackson's dissent in *Dalehite v. U. S.*, 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (1953) that "it is not a tort for government to govern." That court in *Johnson, supra,* emphasizes the need for assurance of judicial abstention in areas where responsibility for basic policy decisions rests in coordinate branches of government.

The finding under the above criteria that a challenged act involved the requisite "discretion" may not be enough to bar liability in all cases. Recent cases have required, in addition to the above, that the municipality make a showing that a policy decision consciously balancing risks and advantages actually took place. *King v. City of Seattle*, Wash.Supr., 84 Wash.2d 239, 525 P.2d 228 (1974); *Johnson, supra,* 73 Cal.Rptr. at 249, 447 P.2d at 361 (note 8). Note that this does not involve an inquiry into the merits or outcome of the challenged policy or deci-sion. The whole philosophy of "public policy" non-liability is to avoid evaluating the propriety of the act unless or until the nature of the act is found to be such that it can be exposed to liability. As Judge Learned Hand wrote in *Gregoire v. Biddle,* 2d Cir., 177 F.2d 579, 581 (1949):

> "In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

■ All this points up the futility in attempting to define a formula or equation which can be applied to each and every situation to determine liability or non-liability. The futility itself, however, demonstrates that there can be no mathematical formula just as there has been no magic in the arbitrary categorization of acts being "governmental/proprietary", "public duty/private duty" or "administrative, discretionary/ministerial." Each case must be scrutinized on the facts as presented. Based on that record, the question of whether the trial should continue becomes a question of law which should be resolved by the trial judge. See *Westminister Investigating Corporation v. G. C. Murphy Company, supra; Frankfort Variety, Inc. v. City of Frankfort, supra; Monarch Insurance Co. of Ohio v. District of Columbia*, D.D.C., 353 F.Supp. 1249 (1973).

■■ The fundamental principal, implicit or explicit, in all the cases is that a municipality cannot be held to a standard of strict liability for police and fire protection. To impose the duty of an insurer on these men and women would be to utterly ignore the difficulty and danger inherent in the tasks they are required to perform. An acceptance of such a doctrine might facially run contrary to the spirit of the decisions in *Spencer, supra,* and *Thomas, supra.* But the distinction now is well documented. The rule is "liability" not "immunity" but exceptions to liability are necessary when public policy considerations far outweigh the value of an individual property. For instance, if under riot conditions snipers are shooting at police and firemen who respond

to scenes of violence and arson, any discretionary decision to restrict municipal response to the conflagration for the purpose of saving lives must take precedence over the value of mere property. Any argument that attempts to question the merits of that decision based on a full and complete record of the exigent circumstances presented to those who made the decisions leads to an attempt to second guess executive decisions. The danger in that process is the jeopardy of impairing the governing process itself.

■ The argument for a case by case analysis to determine whether there shall be no liability based on public policy considerations has support in an analysis of fundamental tort liability when applied to areas such as fire and police protection. A motorist, for instance, has the duty to use due care in the operation of his automobile and the standard to measure that duty is whether his conduct was "reasonable under the circumstances." If such a requirement were to be applied to police and fire protection, the results would be absurd. The case of a robbery victim who would hold the city liable for lack of police protection is an example. Would the case go to the jury on the basis that the protection afforded the victim was not reasonable under the circumstances? Does a judge and jury then look at all the facts to determine whether less than that could be necessarily unreasonable? But even more, would not that call into play an inquiry into basic public policy decisions on budgets, taxation and the allocation or deployment of municipal resources? Also, how does one measure the vagaries of criminal conduct? This points up the argument for non-liability in cases where fundamental tort liability was never heretofore recognized. The concept has been named foreseeability but what is suggested is that basically we are discussing "duty." Does the decision of a city to institute police and fire protection create a duty on the city running to each and every citizen to protect them from all hazards? Certainly not! Any standard less than guaranteed protection, such as the reasonableness of their actions, calls into play an examination of the public policy decisions which resulted in less than guaranteed protection. This we cannot permit.

A Florida court considering the issue cited the *Report of the National Advisory Commission on Civil Disorders* as the nature of the police function under riot conditions:

". . ., the point was frequently made that police visibility was often an operative factor in the raising of tensions, and that withdrawal from an area could be a highly useful tactical tool for the relaxing of tensions in certain situations. The sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence. . . . Who can say whether or not the damage sustained by petitioners would have been more widespread if the officers had stayed, and because of a resulting confrontation, the situation had escalated with greater violence than could have been controlled with the resources immediately at hand?" *Wong v. City of Miami*, Fla.Supr., 237 So.2d 132, 134 (1970).

Exceptions are necessary, however, and the holding in *Thomas, supra,* is an example of the type of situation where liability is based on "foreseeability" or "duty." In *Spencer, supra,* the crossing guard's duty to protect minor school children at intersections is an example of the assumption of responsibilities by the city which results in the creation of a "duty" to intended beneficiaries. When the city stoops to interfere in the daily lives of our citizens by assuming the responsibilities of parents or abrogates the meaning of "buyer beware", it must be prepared to assume the consequences of their dereliction. Conversely, a recognition of no personal duty which guarantees a citizen protection from a criminal in a general sense, apart from the circumstances like *Schuster v. City of New York*, N.Y.App., 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958), poses moral questions best resolved by legislative act. An example of that is the Victim's Compensation Act, 11 *Del.C.* 9001, et seq. The Act is subtle recognition that although there is no

personal duty between the state and a private citizen which guarantees protection from criminals, the harshness of the situation is best ameliorated by some form of statutory compensation, an idea not founded on traditional tort liability but out of moral considerations for the victims of society's and government's inherent limitations. This is the preferable solution rather than redress by judicial "legislation."

Although Plaintiffs do not allege abuse of or failure to exercise discretion and thus do not raise the issue of the actual decision process in this case, the Donohue affidavit sets forth the information relayed to the Battalion Chief and some of the considerations on which he based his decision. It should be remembered that the directive was rendered after the officer reached the scene of the civil disturbance some two blocks from the Plaintiffs' shop. Donohue was notified of a "small trash fire" at Fourth and Harrison Streets. Although the lack of mention of the fire in Plaintiffs' store (already blazing at 6:30 p. m. according to Edna Keatts) from Barry's report raises questions, Donohue should not be penalized for acting on incomplete information, if that be the case, where it has been shown that he considered what information was available at the time. Perhaps the key information was that "the temper of the civilians in the area was at the breaking point" according to Barry. Granted, the record could be more illuminating as to what Donohue observed at the scene and his view of the potential consequences of his decision. Despite its deficiencies, however, the Donohue affidavit would meet the minimum requirements of a "considered decision" if challenged by Plaintiffs on that basis.

■ The Battalion Chief's directive qualifies as a "basic policy decision" despite the facts that it took place at what might be termed the "operational" level on the scene of disorder. This is also true of Donohue's later orders at the fire delaying deployment of fire equipment until police units could quell the "hostile mob" which had assembled. (It is unclear whether these acts are included within the allegations of the complaint.) Firefighting is clearly an important municipal function which would be unduly inhibited by excessive intervention by the courts at the tactical level. The challenged act was obviously essential to the basic governmental objective of fire fighting and the urgency of the situation called for judgment and expertise in reacting to emergency conditions. No specific showing was made as to the authority of the Battalion Chief but neither was his authority challenged by Plaintiffs. In the absence of contentions or evidence to the contrary, it is assumed that Donohue acted with authority and duty to act.

Guided by underlying policy considerations and ignoring arbitrary planning/operational, discretionary/ministerial or governmental/proprietary distinctions and apart from the question of municipal immunity, the Court concludes that the issuance of the Battalion Chief's directive was an on-the-scene tactical decision, peculiarly the province of the executive branch, which ought to be free from judicial second-guessing. As in the *Monarch Insurance* case, *supra*, it is clear that policy considerations pervaded the challenged decision. Summary judgment is granted as to this allegation.

■ To the extent that paragraph 6(c) alleges the City's decision to withhold police and fire protection from the Plaintiffs as it relates to the Battalion Chief's coordination of police and fire units, his on-the-scene decisions are shielded from liability by the same considerations. (Again, the allegations are very broad and loosely pleaded.) To the extent that paragraph 6(c) alleges that the civil disturbance and the control of it was the result of the City's failure to provide adequate police protection, summary judgment is granted against it. It states no cause of action for which relief can be granted. There was no duty running from the City to the Plaintiffs, the breach of which could be the basis for tort liability. (The allegations of this paragraph are very general and also may not be sufficient to withstand the particularity required by our rules. That question is moot, however, in

light of this decision.) Among the alternate remedies available to Plaintiffs would be insurance, private damage actions and legislative action to compensate riot victims.

 There remains the motion applicable to paragraph 6(b). Initially, it should be noted that to the extent that the delay in responding to the fire resulted from the order to confirm reported fires and await escort, the City has no liability based on the preceding portions of this Opinion. However, the record does not rule out the possibility that other factors may have caused the delay. Unlike the two allegations discussed above, the evidence fails to establish that this delay was a product of public policy considerations (riot control tactics) or action for which the City has no duty to Plaintiffs. In fact, the record is silent as to action taken by the City prior to the report of the fire to Donohue at 6:58 p. m. Thus, the record is devoid of essential facts from which this Court can make a legal decision and summary judgment cannot now be granted as to this allegation. Recognizing that Plaintiffs' paragraph 6(b) remains a viable part of their complaint does not mean that the City will be subject to liability for a delay in responding to fires. The holding in this case is attributed to a sparse record which simply fails to explain the City's conduct in full. Thus, it may be that hitherto unrecorded evidence may come to light either prior to or during trial from which a judge can rule as a matter of law on the question of liability.

Obviously, the facts which would demonstrate some relationship between the Plaintiffs and the Defendant creating a duty could negate the public policy aspects of this decision. *Spencer, supra; Thomas, supra; Motyka v. City of Amsterdam, supra.*

IT IS SO ORDERED.