**PROGRESSIVE INSURANCE COMPANY (PAGO PAGO) LIMITED, Plaintiff,**

**v.**

**DEPARTMENT OF PUBLIC SAFETY FIRE BUREAU of the AMERICAN SAMOA GOVERNMENT and AMERICAN SAMOA POWER AUTHORITY of the AMERICAN SAMOA GOVERNMENT, and NATIONAL PACIFIC INSURANCE LIMITED, jointly and severally, Defendants.**

High Court of American Samoa
Trial Division

CA No. 36-04

September 29, 2005

246

Before RICHMOND, Associate Justice; SAGAPOLUTELE, Associate Judge; and TAPOPO, Associate Judge.

Counsel: For Plaintiff, William H. Reardon and Devin A. McRae, *Pro Hac Vice*
For Defendant American Samoa Government, David Cassetty, Assistant Attorney General
For Defendant American Samoa Power Authority, E. Mason Martin III and Elton John Bain, *Pro Hac Vice*
For Defendant National Pacific Insurance Ltd., Jennifer L. Joneson

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

We will once again assume the reader is familiar with the facts of this case. On May 10, 2005, Plaintiff Progressive Insurance Company ("Progressive") filed a motion for partial summary judgment against Defendant Department of Public Safety Fire Bureau of the American Samoa Government ("ASG") contending that there is no genuine issue as to any material fact that ASG owed a duty, and breached a duty, when it responded to the April 20, 2002 fire at the Laufou Shopping Center. On June 10, 2005, we tentatively agreed to bifurcate Progressive's motion to first address the legal issue of "duty." On July 11, 2005 we issued an order rejoining the issues of duty, breach of duty, and liability so that we could evaluate the full record within the context of the Government Tort Liability Act ("GTLA"). Having conducted a further hearing on July 19, 2005, on the remaining partial summary judgment motion, and having considered the extensive record and legal arguments, we now grant in part and deny in part Progressive's motion.

## Discussion

### I. Governmental Duty under Common Law

■ The parties first discuss whether, under common law, ASG owed a duty to Progressive to put out the fire in a nonnegligent manner. We note at the outset that although the parties describe various common law doctrines, such as the "governmental function" doctrine and the "discretionary function" doctrine, these theories pertain to liability once a duty and breach of duty have been found. They do not relate to the limited issue of duty itself. Thus, we save for later the common law and statutory doctrines applicable to liability, addressing them only after a breach of duty, i.e., negligence, is established.

We now focus on the issue of ASG's duty, examining the "public duty" doctrine and "special duty" exception that relate to the issue of whether a governmental entity owes a duty to Progressive at all. If a court adheres to the "public duty" doctrine, it will find that the governmental entity owes a duty to the public as a whole, but, recognizing that the governmental entity operates with limited resources and capabilities, does not owe an actionable duty to every single individual for injuries which arise from its failure to furnish adequate protection. *See, e.g., Myers v. McGrady*, 613 S.E.2d 334 (N.C. App. 2005). Only where an individual can show that he was singled out from the public such that a "special relationship" existed between him and the governmental entity may the government be found to owe him a duty. *Clarke v. City of New York*, 18 A.D.3d 796 (N.Y. App. 2005) (a municipality may not be held liable for its failure to provide adequate fire protection absent a special relationship between the municipality and the injured party).

Such a special relationship may be formed where the governmental entity voluntarily assumes a protective duty towards a certain member of the public, undertakes actions on behalf of that member, and in turn induces reliance. *See Williams v. State*, 664 P.2d 137 (Cal. 1983) (noting further that a duty may be formed by an affirmative state act which places a person in peril or increases the risk of harm). This assumption of duty is like that of the "good Samaritan" rule noted by the parties in *Edwards v. Honeywell, Inc.*—that "a rescuer is required to act nonnegligently even if he was not obliged to attempt the rescue in the first place." 50 F.3d 484, 487 (7th Cir. 1995). But it is also true that governmental *inaction* may create a special duty of care "where it would be apparent to the public officer that his failure to act would be likely to subject an identifiable person to imminent harm." *Romano v. City of Derby*, 681 A.2d 387, 389 (Conn. App. 1996); *see also Babcock v. Mason County Fire Dist. No. 6*, 30 P.3d 1261, 1268 (Wash. 2001).

248

Although no single bright line rule exists for determining whether a special duty has been created, courts have fashioned various formulas for dealing with this issue. One such formula includes the following four factors:

> (1) the municipality had actual knowledge of a dangerous condition;
> (2) the injured party reasonably relied on representations and conduct of the municipality or its agents so as to forego other ways of protecting himself;
> (3) the duty of care was created by an ordinance or statute setting forth mandatory acts for protections of a particular class; and
> (4) the municipality did not exercise due care to avoid increasing the risk of harm.

*Miskovich v. Independent School Dist. 318*, 226 F. Supp. 2d 990, 1034 (2002) (applying Minnesota law); *see also Hernandez v. Village of Cicero*, 502 N.E.2d 1226, 1228 (Ill. App. 1986); *Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C. 1983) (finding special duty where there has been "(1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim.").

However, despite acceptance by some courts, this judicial distinction between "special" and "general" duty has not been uniformly embraced. Other jurisdictions reason that the public duty doctrine is no longer viable in the face of statutory abrogation of a sovereign's immunity from liability. These courts leave it to the province of the legislature to determine whether the duty owed by the governmental entity to the injured party should depart from the common law principles that apply to private individuals. In *Adams v. State*, for example, the court explained that:

> [T]he 'duty to all, duty to no-one' doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine . . . . Why should the establishment of duty become more difficult when the state is the defendant? Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not.

555 P.2d 235, 241-42 (Alaska 1976) (superseded by statute on other grounds); *Beaudrie v. Henderson*, 631 N.W.2d 308, 314 (Mich. 2001) (criticizing the public duty doctrine as merely a reformulation of

common-law governmental immunity, an area already dealt with by statute); *Ryan v. State*, 656 P.2d 597 (Ariz. 1982); *Brennen v. City of Eugene*, 591 P.2d 719 (Or. 1979).

Under this view, where a legislature has in part abandoned sovereign immunity and exposed the sovereign to *liability* for tortious acts, the sovereign may no longer hide behind the alternative common law position that it held no *duty* to the plaintiff in the first place for which it could be held liable. *See Martinez v. Lakewood*, 655 P.2d 1388, 1390 (Colo. App. 1982) (noting that the state's governmental immunity statute, although not directly applicable to the issue of public duty, addressed the issue of sovereign immunity and stated that the intention of the legislature was to treat the public entity as if it were a private person); *but c.f. Lovelace v. City of Shelby*, 526 S.E.2d 652, 654 (N.C. 2000) (retaining the public duty doctrine under North Carolina law and extending it to both state and municipal agencies, but limiting its application to the law enforcement context and not fire protection). Therefore, a court adopting this view should abandon the "public duty"/"special duty" distinction and look instead to a more traditional standard of duty, such as whether "the defendant's exercise of care foreseeably created an unreasonable risk to others." *Coffey v. City of Milwaukee*, 247 N.W.2d 132, 139 (Wis. 1976) (holding that "[a]ny duty owed to the public generally is a duty owed to individual members of the public").

## II. Governmental Duty and the GTLA

 Given this backdrop, we now examine ASG's duty to Progressive, if any, in accordance with the provisions of the GTLA. Under A.S.C.A § 43.1203(a), "[t]he government is liable, except as otherwise provided in this chapter, in the same manner and to the same extent as a private individual under like circumstances . . . ." The Federal Tort Claims Act, upon which the GTLA is modeled, likewise holds that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In examining whether the governmental entity should be found liable, the court must define liability "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see Richards v. United States*, 369 U.S. 1, 11 (1962) ("the [FTCA]. . . requires application of the whole law of the State where the act or omission occurred.").

Progressive contends that the "public duty" doctrine, if previously accepted in the territory, is no longer applicable because it is inherently inconsistent with the language and meaning of the GTLA and FTCA. This contention is not as clear as Progressive maintains.

In *Rayonier Inc. v. United States*, railroad sparks set federal lands on fire in the State of Washington and the U.S. Forest Service took exclusive control and direction of all fire suppression activities. 352 U.S. 315, 316 (1957). Over a month later, strong winds revived the fire, which then spread over 20 miles and destroyed the plaintiffs' property. *Id.* at 316-17. The appellate court held that the United States was immune from liability for any negligence by the Forest Service in fighting the fire because Washington law would preclude similar liability against local firefighters for the negligent conduct. *Id.* The Supreme Court disagreed, holding "that the courts below erred in deciding that the United States was immune from liability for any negligence by the Forest Service in fighting the fire." *Id.* at 317-18. Interpreting the FTCA, the Court reasoned that the test was not if Washington law would impose liability on its own local government for negligent conduct, but if Washington law would impose liability on private parties for acting negligently. *Id.* at 318. In turn the Court concluded that the United States could be held accountable for the negligence of its firefighters. *Id.* at 319; *see also Anderson v. United States*, 55 F.3d 1379 (9th Cir. 1995) (holding that because private landowners under California law can be held liable for the negligent setting of or failing to control fires on their property, so too can the United States government).

■ However, although *Rayonier* and *Anderson* address the question of governmental liability once negligence is established, the "public duty" doctrine serves to identify the existence of the underlying duty itself; that is, whether a cause of action for negligence can be asserted against the government in the first place. Thus, while *Rayonier* may reasonably imply, as Progressive holds, that the FTCA subjects the government to the same *duty* as a private individual under like circumstances, other cases suggest that where a governmental entity still adheres to the public duty doctrine, and holds that the governmental entity did not form a special relationship with the plaintiff, a plaintiff may be unable to establish the requisite negligence to initiate a claim under the FTCA.

For example, in *Louie v. United States*, an off-duty soldier in the State of Washington was arrested for DWI and was not monitored by military police. 776 F.2d 819, 821 (9th Cir. 1985). Early the next morning, the soldier drove his car onto the highway and caused a head-on collision, killing the driver of the other vehicle. *Id.* The victim's family brought suit against the United States Army under the FTCA seeking damages for wrongful death. *Id.* The court noted that in actions arising under the FTCA the government is liable for the negligence of its employees "in the same manner and to the same extent as a private individual under like circumstances." *Id.* at 824 (*citing* 28 U.S.C. § 2674). The court held that the circumstances of the case involved government employees acting

in a law enforcement function. *Id.* at 825. It determined that because the power and authority to arrest, to maintain custody, and to lawfully restrict a person's liberty are unique to the law enforcement function, the inquiry into the government's liability must include an examination of the liability of *state and municipal entities* under like circumstances. *Id.*

Recognizing that Washington adhered to the "public duty" doctrine, the court observed that under Washington law the "doctrine applies to a preliminary determination whether a duty exists and does not alter the underlying liability imposed on political subdivisions and municipalities." *Id.* The court reasoned that because the plaintiff could not establish the formation of a special relationship between her and the government, under Washington law "the government owed no duty to [plaintiff] to control the actions of an intoxicated but orderly serviceman, and that the government is, therefore, not subject to liability under the Federal Tort Claims Act." *Id.* at 827; *J & B Development Co., Inc. v. King County*, 669 P.2d 468 (Wash. 1983) (concluding that the "public duty" doctrine is not another form of sovereign immunity abrogated by statute; although municipal corporations shall be liable for damages to the same extent as if they were a private person, the concepts of duty and liability exist independently).

In a similar case, *Stratmeyer v. United States*, cattle lessees brought an action against the government under the FTCA, alleging negligence by a United States Department of Agriculture veterinarian for failing to quarantine cattle owned by a cattle supplier. 67 F.3d 1340, 1342-43 (7th Cir. 1995). Recognizing that to succeed under the FTCA plaintiffs must be able to "state a claim that is actionable under the substantive law of Indiana," it noted that Indiana law recognized the "public duty" doctrine. *Id.* at 1344. Because, the court reasoned, no special relationship was formed between the veterinarian and plaintiffs, "[w]e hold that the plaintiffs have failed to establish, under Indiana law, the existence of a duty owed to them by the USDA veterinarian, and therefore that they have no claim against the United States under the FTCA." *Id.* at 1348; *see also Ochran v. United States*, 273 F.3d 1315 (11th Cir. 2001) (holding that witness did not allege facts which supported violation of a duty under Florida law, a prerequisite to liability under the FTCA); *Bergquist v. U.S. Nat. Weather Service*, 849 F.Supp. 1221, 1224 (N.D. Ill. 1994) (plaintiff precluded under Illinois "public duty" doctrine from asserting FTCA claim against National Weather Service for damages and losses for failure to issue tornado storm warnings). Therefore, despite the holding in *Rayonier*, we recognize that many courts distinguishing between "duty" and "liability" have found the "public duty" doctrine to be wholly consistent with the statutory waivers of governmental immunity.

With the above cases in mind, we must decide whether, under the GTLA, ASG should be subject to the same standard of duty as a private person, or alternatively if a plaintiff must set forth a special relationship he or she has with ASG before a duty may lie. Following the philosophy of *Adams v. State*, we now hold that even if the public duty doctrine once garnered judicial acceptance prior to the enactment of the GTLA, the doctrine is no longer valid in the territory to the extent that it holds the government to a different standard of duty than a private individual. *See Adams v. State*, 555 P.2d at 241-42. Although we concede that the GTLA speaks only to ASG's *liability*, and does not expressly address the issue of duty, we believe that the spirit and intent of the GTLA, unless expressly stated otherwise in the statute, was to place ASG on par with a private individual during all phases of a court's review of alleged tortious conduct. Given this intent, we will treat ASG as we would a private person when considering not just liability, but also duty and breach of duty, and disregard any potential common law differentiation with regard to the analysis of the latter two.

Having reasoned that as a matter of law, ASG may be subject to the same standard of duty as a private person, we must now analyze whether such duty actually arose in this case. Interpreting the facts in a light most favorable to the non-moving party, we hold that there is no triable issue as to whether ASG, acting through its Fire Bureau, had a duty to put out the fire non-negligently. Progressive, therefore, is entitled to summary judgment on this issue.

The common law rule, of course, is that generally there is no duty to intervene in order to prevent the misconduct of a third person or protect another. *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 804 (Minn. 1979); *see also* RESTATEMENT (SECOND) OF TORTS § 315 (1965). On the other hand, once a duty to act for the protection of others is voluntarily assumed, due care must be exercised even though there was no duty to act in the first instance. *Id.* at 806 (observing that the "special duty" exception to the public duty doctrine is no different than the common law concept of "assumed" duty).

Here, we do not face a situation where a party chose not to intervene. Rather, the Fire Bureau firefighters arrived on the scene within 30 minutes after the blaze began and remained there for nearly 15 hours to suppress the fire. Clearly then, on April 20, 2002, the Fire Bureau firefighters volunteered their services to take control of the firefighting operations and had knowledge of the hazardous conditions. Consequently, we hold that the firefighters' actions sufficiently induced reliance by the building owner to forgo alternative methods of fire protection. In turn, we conclude that the firefighters' conduct imposed

upon it a duty to act in a non-negligent manner in putting out the fire, and a duty to avoid increasing the risk of harm.

## III. Breach of Duty

 We next turn to the issue of whether ASG breached its duty. ASG suggests that that we may not make any conclusions of law as to whether there was a breach of duty in this case. ASG notes that in *Utu v. National Pacific Ins. Co*, we reasoned that "even where there are undisputed facts, because negligence actions revolve around the reasonableness of a party's conduct, they cannot ordinarily be disposed of by summary judgment." 9 A.S.R.2d 88, 94 (Trial Div. 1988) (internal citations omitted). ASG interprets this to mean that even where facts are certain, issues of "reasonableness" are based on the community's own standard of what is or is not appropriate conduct, and therefore require a review by the fact finder, as opposed to a court determination of reasonableness as a matter of law. While we agree that the conduct of laypersons may be defined according to the general standards of reasonableness of the community, where the defendant is an expert accused of breaching his duty of care in his given area of expertise, we hold that the standard of reasonableness is that of the professional acting in accordance with the standards of his industry. Therefore, the court may ascertain reasonableness as a matter of law if sufficient uncontroverted evidence of the standard is available.

 Indeed, under RESTATEMENT (SECOND) OF TORTS § 299A (1965), "one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Comment G to § 299A further elaborates, noting that the appropriate standard of care is "that of persons engaged in similar practice in similar localities, considering geographical location, size, and the character of the community in general." Based on this logic, we conclude that our analysis of breach of duty turns not on whether a reasonable layperson in the territorial community would have tried to put out the fire in a similar manner, but whether skilled public firefighters acting in accordance with the norms of professional conduct in a similarly situated community would have so acted.

 ASG contends that if we hold the firefighters to such a professional standard of care, internal Fire Bureau policies should not be the benchmark upon which duty is defined. We agree. ASG notes, for example, that much of the fire equipment received in the territory comes from outside donations. If internal Fire Bureau policies were to state that a certain article of equipment is standard issue, but in reality such equipment exceeds the norm for firefighters in similar communities as

American Samoa, we would not find the Fire Bureau to have violated its standard of care for failure to obtain such equipment; the standard of care is that of the similarly situated professional community, and not the higher threshold set forth by internal procedure. *See Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990) (protocols and procedures do not have the force of statute, but rather provide officials with guidance on how they should perform their duties); *Titchnell v. United States*, 681 F.2d 165 (3d Cir. 1982) (noting that allowing one's internal policy to set the standard of care would unfairly penalize those who choose to exceed the recognized standard of care of the profession).

 At the same time, however, we agree with Progressive that internal Fire Bureau policy should not be ignored. The Fire Bureau's enumerated policies are likely a strong evidentiary indicator as to what the prevailing community standards of firefighting are in the territory. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 413 (Tex. App. 2003) (internal policies and procedures do not, alone, determine the standard of care, but may be considered in determining that standard); *Lugtu v. California Highway Patrol*, 28 P.3d 249 (Cal. 2001) (officer safety manual did not establish the applicable standard of care, but could be considered by the trier of fact to determine whether or not an officer was negligent). Given that we are asked to ascertain the professional community standard, and not evaluate deviation from internal policies of the Fire Bureau alone, we conclude, as we did in *Meredith & Assocs. v. Blue Pacific Mgmt. Corp.*, that the standard of care should ordinarily be provided by expert witnesses who testify to the customs or prevailing standards of the profession. 28 A.S.R.2d 60 (Trial Div. 1995).

██ Even so, we need not explore every alleged instance of the Fire Bureau failing to adhere to its standard of care. We note that even if we were to find that the Fire Bureau did not meet such professional standards, this does "not answer the question of to whom the duty to act according to that standard of care extends." *Owens v. Unified Investigations & Sciences, Inc.*, 166 S.W.3d 89, 93 (Mo. App. E.D. 2005). For example, assume we were able to find, hypothetically, that the Fire Bureau breached its standard of care by not providing its firefighters with protective equipment that met professional community standards. If the lack of such protective equipment could affect only the personal safety of the firefighters themselves, with no impact on their ability to put out the fire, the failure to meet this standard of care may relate to a breach of duty as to the firefighters themselves, but not to the holder of the property. In order to find that the failure to adhere to the standard of care translates into a breach of duty to the parties in this case, we agree with the court in *Owens* that such a breach exists only where a person would be *foreseeably* harmed by the failure to adhere to a standard of care. *Id.*

■■■■■ We recognize the long held rule that foreseeability of risk or harm is a question to be determined by the fact finder, and not in pretrial proceedings. However, we also realize "where reasonable minds could arrive at only one conclusion, the trial court may determine the question of foreseeability as a matter of law." *See Kurtz v. Unified School Dist. No. 308*, 65 Fed. Appx. 257, 261 (10th Cir. 2003). In this case, we are prepared to say that, as a matter of law, a failure to reasonably inspect the fire hoses according to professional standards of care would pose foreseeable harm to Progressive. It is undisputed that a hose with a leak will have less water pressure to fight a fire than a fully operational one, and will therefore impact the property owner.

■■■ Similarly, protective fire equipment also affects the property owner. By the very nature of protective equipment, the failure of the Fire Bureau to meet its standard of care in providing its employees with such equipment as helmets, protective jackets, pants and boots, breathing apparatuses, and flashlights, would result in a breach of duty to the firefighters themselves, for they suffer an increased risk or harm in combating the fire. It should not require a great stretch of imagination to see that this same failure to meet its standard of care would also foreseeably pose greater harm to the property holder. As Chief Moana has observed, where a firefighter lacks protective gear, he is unable to effectively enter into a burning building. Likewise, he observes that without a flashlight a firefighter will be unable to fully see the premises when fighting a fire at nighttime. As a matter of logic, it cannot be reasonably disputed that the lack of protective gear will deter a firefighter from fully engaging the force of a fire. Thus, where this lack of equipment is the result of a failure to meet its standard of care, ASG, by its Fire Bureau, may also be regarded as having breached its duty to Progressive in this case.

■■■■■ For similar reasons, we conclude as a matter of law that it is foreseeable that failure to exercise the proper standard of care regarding communications on the scene, and failure to exercise the proper standard of care in informing proper authorities of any faulty fire hydrants prior to the fire, would cause harm to a property holder and thus amount to a breach of duty.

Nevertheless, while we conclude that a breach of duty to Progressive may exist if the Fire Bureau failed to exercise its standard of care in the above circumstances, we have yet to address the issue of whether the standard of care was violated, or more fundamentally, what that standard is. With regard to disputes over fire equipment, ASG disagrees with Progressive's assertion that there was insufficient fire equipment available to fight the fire. ASG contends that the Fire Bureau cannot be faulted for sending

responders to the scene without full protective equipment, because such equipment, including functional protective coats, gloves, and pants, were unavailable. Even if true, however, the question remains whether failure to own such equipment itself would amount to a violation of the Fire Bureau's standard of care, and in turn amount to a breach of duty to Progressive as a matter of law.

While we presume that there is a certain minimum standard of fire fighting capability and training that must exist in all jurisdictions, regardless of locality, we recognize that American Samoa, by its geographical isolation, economy, and infrastructure, should not be held to the same standard as fire agencies on the U.S. mainland. We are therefore unprepared, absent clear testimony comparing the firefighting capabilities used in this case with those used in similarly situated municipalities, to state as a matter of law what this threshold would be. Although Chief Moana, as Progressive indicates, has testified that the use of protective equipment and knowledge of the location of fire hydrants is "fundamental" to effective firefighting, we do not yet have sufficient evidence indicating whether such knowledge or access to such equipment is the norm in communities such as our own. Because we anticipate that different experts will no doubt have different conclusions as to the Fire Bureau's appropriate standard of care, we find it best to reserve judgment on the issue of breach of duty and leave such determination to the trier of fact. Stated in short, although we hold that ASG had a duty to the property owner to put out the fire in a non-negligent manner, the testimony before us has not yet borne out what the standard of negligence may be.

In concluding that expert testimony is necessary to define the appropriate standard of care, however, we do not require the parties to begin from scratch. Progressive has provided an exhibit containing 125 "undisputed facts." These facts include assertions made in deposition testimony by Chief Moana, firefighter Juliano Tavale, as well as other exhibits and affidavits. To the extent that these facts are indeed undisputed by the parties at the time of this order, such facts will be deemed admitted, and may be considered, where admissible, by the trier of fact in determining the Fire Bureau's standard of care in the territory and whether a violation of that standard, and subsequent breach of duty, has taken place.

## IV. Common Law and Statutory Liability

Although we leave the question of negligence to the trier of fact, it is a question of law whether ASG should be found liable if the trier of fact declares the Fire Bureau negligent. While the "special duty" doctrine addresses whether the governmental entity has any duty at all to a specific individual, it does not speak to the separate issue of whether the

governmental agency should be subjected to liability under the common law.

■ Under the "governmental function" liability theory, an elaboration on sovereign immunity, "there can be no recovery against a municipal corporation for injuries resulting from its negligence or nonfeasance in the exercise of functions essentially governmental in character." *Valevais v. City of New Bern*, 178 S.E.2d 109, 112 (N.C. App. 1970). Adhering to this view, a governmental entity is immune from liability in performing what may be regarded as "unique" or "essential" governmental functions, but remains liable for negligence in undertaking traditionally "non-governmental" or "proprietary" actions—the rationale being that "in launching a profitmaking enterprise, a [governmental entity] leaves the sphere that is exclusively its own" and waives its sovereign immunity. *See Edelman v. Jordan*, 415 U.S. 651, 695 (1974).

The first problem, as many courts note, is that "[w]hether a function is governmental or proprietary in nature is not always easy to ascertain." *Webb v. Jackson*, 583 So.2d 946, 952 (Miss. 1991); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955) (noting that a comparative study of cases reveals a "quagmire that has long plagued the law of municipal corporations."). In addition to the categorization problem, the Supreme Court in *Garcia v. San Antonio Metro. Transit Auth.*, analyzing the doctrine as it relates to state government immunity, observed that as a policy matter the problem with a doctrine which seeks to examine and delineate historically "traditional" governmental functions "is that it prevents a court from accommodating changes in the historical functions of States, changes that have resulted in a number of once-private functions like education being assumed by the States and their subdivisions." 469 U.S. at 543-44. Nevertheless, absent statutory waivers of sovereign immunity, such as the GTLA, the doctrine is often preserved. *See Texas River Barges v. City of San Antonio*, 21 S.W.3d 347, 356 (Tex. App. 2000) (noting that cities retain immunity for governmental functions unless the legislature has expressly waived that immunity).

■ A second qualified immunity doctrine under common law, the "discretionary function" doctrine, limits governmental liability on principles of deference. Based on "the principle that certain decisions of the executive or legislative branches of government should not be reviewed by judge or jury," the doctrine holds that if the governmental entity's tortious act originates from a "discretionary" act of policymaking or planning, as opposed to a "ministerial" act of policy execution or failure to execute, the governmental entity will not be held liable. *See Rieser v. District of Columbia*, 563 F.2d 462 (1977) (noting that this doctrine is now favored over the "governmental-proprietary" test because

of its more workable distinction); *Biloon's Elec. Service, Inc. v. City of Wilmington*, 401 A.2d 636, 641 (Del. Super. 1979) (noting that the doctrine is based on the view that "it is not a tort for government to govern."). Although there is no bright line test to determine whether an act is "discretionary" or "ministerial," a court will generally consider discretionary decisions as governmental actions requiring "personal deliberation, decision and judgment" and "ministerial acts [as those which] require little or no judgment, and generally constitute mere obedience to orders or performance of a duty in which the municipal employee has little or no choice." *See Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995).

Thus, in *Chandler v. District of Columbia*, where the district made a decision to close a number of its fire stations on a rotating basis because of budgetary concerns, the court found the district immune from liability in a negligence action for failure to reach a fire that led to the death of two children. 404 A.2d 964, 965 (D.C. 1979). It reasoned that because the decision to close the station was the result of policy considerations in managing the budget, it was a discretionary decision which released the city from liability. *Id.* at 966; *see Nealon*, 669 A.2d at 691 (finding that the city's decision to temporarily decrease water pressure in its fire hydrants was likewise a discretionary decision relating to city resource allocation and fire protection); *see also Biloon*, 401 A.2d at 639 (discretionary action where fire officials delayed entry to fight fire until police backup arrived to control angry mob).

On the other hand, in *Harry Stoller and Co., Inc. v. City of Lowell*, where, in contrast to generally accepted firefighting practices, firefighters chose not to fight a fire with building sprinkler systems, and instead used only hoses, the court found the city liable for the resulting fire damage. 587 N.E.2d 780, 785 (Mass. 1992). Because the decision not to use sprinklers "was not founded on planning or policy considerations," the court found it to be ministerial in nature. *Id.* (discussing statutory preservation of the common law discretionary function doctrine); *see also Courson ex rel. Courson v. Danville School Dist. No. 118*, 704 N.E.2d 447, 450 (Ill. App. 1998) (noting that despite codification of discretionary immunity, cases continue to employ common law definitions of discretionary and ministerial functions).

■ As the common law has been supplanted by the GTLA, we must now examine to what extent ASG may be held liable if it is found to have negligently breached its duty under the statutory language. Although the GTLA generally subjects ASG to liability in the same manner and to the same extent as a private individual under like circumstances, GTLA § 43.1203(b)(2), which is similar to 28 § U.S.C. 2680(a) of its federal counterpart, holds that such liability does not lie for "any claim based

upon the exercise or performance of, or the failure to exercise or perform, a discretionary function or duty on the part of an officer or employee, whether or not the discretion involved is abused." In other words, the GTLA, like the FTCA, has codified and retained the common law "discretionary function" doctrine.

Turning again to the record before us, examined in a light most favorable to the non-moving party, we conclude that ASG's decisions, like *Harry Stoller* above, were ministerial in nature, thus rendering the "discretionary function" inapplicable in determining ASG's liability. In this case, although Chief Moana testified that Fire Bureau standards require the use of personal protective clothing, responders on the scene were not wearing full protective gear and were forced to retreat from the interior of the building. ASG fails to assert any articulated policy reason to explain the failure to depart from such guidelines.

Similarly, Fire Bureau procedures hold that the officer in charge shall constitute the field command through which all communications are channeled. Deposition testimony, such as that of Afoa Ne`emia, indicates that when the Fagatogo fire crew arrived to assist the Tafuna crew, it decided to fight the fire on the back side of the building without any consultation with the Tafuna crew already in place. We are aware of no articulated policy reason to explain the failure to depart from such guidelines. Additionally, firefighters Tipote and Tavale repeatedly drove the Unit 447 water tanker to the hydrant in front of Steven & Sons for refilling despite the fact that there was a closer fire hydrant available behind Tedi of Samoa. Again, we are aware of no policy reason to explain the reason for traveling the longer distance for tanker refills. While we pass no judgment as to whether the above actions and departures from policy themselves constitute negligence, we are comfortable in our conclusion that the reasons guiding such actions were the result of execution, or failure to execute policy, and not guided by principles geared toward the formulation of public policy in the territory. Therefore, as ministerial decisions, where negligence is found by the trier of fact, liability may lie.

## V. Causation and Damages

 As the parties have not addressed the issue of causation and damages, we leave such determinations to the ultimate trier of fact. It is well settled that, in order for a person to be entitled to recover any damages for a claimed negligent injury, the act complained of must be the direct and proximate cause of the injury, and the damages recoverable are limited to those injuries or losses which are the natural, proximate and probable consequences of the wrong complained of. *See Brothers v. Youngstown*, 685 N.E.2d 822 (Ohio App. 1996). We

recognize that even if the Fire Bureau acted in a swift and competent manner, there exists the possibility that the fire would still have consumed the building with similar ferocity. The inability to extinguish a fire does not presuppose negligence. Thus, if Progressive successfully establishes breach of duty at trial, it must still show that such breach led to the overall extent of fire damage that occurred in this case.

Moreover, if Progressive does establish causation, it will be entitled only to those damages which arose as a result of the negligent conduct. Progressive must therefore provide expert testimony to establish what the damages would have been had the Fire Bureau acted competently. Such damages should then be subtracted from the total damages, with the result being the damages that were proximately caused by the negligent management of the fire. *Id.* (damages recoverable by the plaintiffs would be those damages which occurred as a result of the negligent-reduced water flow in the fire suppression lines).

## Order

By rejecting the "public duty" doctrine, we conclude that the GTLA subjects ASG, acting through its agencies, to the same standard of duty as a private person acting under similar circumstances. Given the undisputed facts in this case, the Fire Bureau firefighters' efforts to take control of the fire in turn established a duty to put out the fire in a non-negligent manner.

Whether the Fire Bureau breached this duty is a more difficult question. Although we have testimony indicating that the firefighters' conduct deviated from internal policy guidelines, the applicable standard of care does not rest on these guidelines. Instead, it turns on the firefighting conduct of similar professionals in similar geographic and economic communities. Accordingly, because to date we do not have sufficient testimony surrounding the community standard, we find the issue of breach is best left to the trier of fact. On the other hand, because the testimony relating to deviation of policy guidelines demonstrates that such departure was made for ministerial reasons, and not discretionary policy reasons, in the event that the trier of fact finds negligence, the GTLA discretionary function exception to liability will not apply, and ASG will be liable in the same manner as a private person under like circumstances.

It is so ordered.